IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MALINA DEE SAVAGE,

    Plaintiff,

v.                                                             CIVIL ACTION NO. 3:20-cv-00482

ANDREW SAUL,
Commissioner of Social Security,

    Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Malina Dee Savage ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on July 17, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Judgment on the Pleadings (ECF No. 12) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 13).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.     BACKGROUND

### A. *Information about Claimant and Procedural History of Claim*

Claimant was 30 years old at the time of her alleged disability onset date and 48 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 177.)¹ She obtained her GED. (*Id.* at 173.) Most recently, she worked as a telemarketer, and she has also been employed as a warehouse worker, a fast-food worker, and a waitress. (*Id.*) Claimant alleges that she became disabled on May 12, 2017,² due to bipolar disorder, agoraphobia, obsessive–compulsive disorder, severe social anxiety, and post-traumatic stress disorder. (*Id.* at 15, 172.)

Claimant filed her application for benefits on May 12, 2017. (*Id.* at 72, 152–60.) Her claim was initially denied on November 15, 2017, and again upon reconsideration on March 15, 2018. (*Id.* at 86–90, 94–96.) Thereafter, on May 7, 2018, Claimant filed a written request for hearing. (*Id.* at 100–02.) An administrative hearing was held before an ALJ on May 5, 2019, in Huntington, West Virginia, and the ALJ presided from Baltimore, Maryland. (*Id.* at 10–48.) On July 24, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 69–85.) Claimant then sought review of the ALJ's decision by the Appeals Council on September 30, 2019. (*Id.* at 151.) The Appeals Council denied Claimant's request for review on May 18, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

---

¹ All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 11.
² Claimant initially gave January 1, 2002, as the onset date of her disability. (Tr. at 177.) She later moved to amend her alleged onset date to May 12, 2017, the date she filed her application for SSI benefits. (*Id.* at 15.)

Claimant timely brought the present action on July 16, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The Commissioner filed an Answer (ECF No. 10) and a transcript of the administrative proceedings (ECF No. 11). Claimant subsequently filed her Brief in Support of Judgment on the Pleadings (ECF No. 12), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 13). As such, this matter is fully briefed and ready for resolution.

B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

1. *Treatment Notes*

On April 19, 2011, Claimant presented to a new primary care physician to establish care. (Tr. at 231.) She reported experiencing "depression, panic symptoms and racing thoughts" and stated that she had previously been prescribed medication for her mental impairments but "she was afraid of them and did not take them as prescribed as she felt she was on too higher [sic] dosage." (*Id.*) Claimant also told her physician that she suffered from chronic obstructive pulmonary disease, emphysema, anemia, and menorrhagia but had not recently been treated for them. (*Id.*) The physician did not note any abnormal findings upon physical examination. (*Id.* at 232.) He diagnosed Claimant with depression and anxiety, chronic obstructive pulmonary disease and tobacco dependence, elevated blood pressure, history of marked anemia, and restless legs syndrome secondary to anemia and prescribed several medications. (*Id.* at 232–33.)

Claimant returned to her primary care physician approximately one month later, on May 26, 2011. (*Id.* at 228.) She reported that she had been using the medication her physician prescribed to treat her depression and anxiety, and "it has helped to some degree." (*Id.*) Her physician directed her to continue using that medication and prescribed an additional medication, and he referred her to a counselor to begin cognitive behavioral therapy. (*Id.*) Claimant also reported that the medication she was prescribed for her anemia and restless legs syndrome had helped her symptoms, and she was directed to continue using it "at bedtime." (*Id.*) The physician did not note any abnormal findings upon physical examination. (*Id.*)

Nearly seven years later, on January 31, 2018, Claimant presented to a counselor to establish care upon a referral from her primary care physician. (*Id.* at 286.) She reported "low mood, crying episodes, excessive worry, difficulty falling and staying asleep, isolation, irritability, feeling on edge, restlessness, fear of leaving her home, strong urges to maintain strict routines . . . avoidance, lack of motivation, fatigue, hopelessness, low self-esteem, fear of failure, and skin picking." (*Id.* at 286–87.) The counselor remarked that Claimant "was a poor historian" with regard to her previous treatment. (*Id.* at 287.) A mental status examination was normal aside from "fair yet anxious" mood and congruent affect. (*Id.*) Claimant was diagnosed with "Mild recurrent major depression," "Generalized anxiety disorder," and "Agoraphobia without history of panic disorder." (*Id.*) The counselor recommended psychotherapy once every other week and suggested that Claimant "establish with psychiatrist for evaluation and possible medication management of symptoms." (*Id.* at 287–88.) She noted that Claimant "appeared motivated towards treatment," but "due to severity of symptoms and reported struggles keeping appointments/leaving her home[,] Prognosis is guarded yet hopeful, with

4

continued engagement in treatment." (*Id.* at 288.) Claimant attended a second session on February 21, 2018, but did not return to the counselor again. (*Id.* at 323, 325.)

Claimant presented to a walk-in clinic on November 19, 2018, complaining of an abscessed tooth and "issues focusing on activity of daily living" without help from antidepressants. (*Id.* at 299.) A physical examination was normal aside from "Mandibular gingival erythema" and "Mandibular gingival swelling on the left." (*Id.* at 301.) The nurse practitioner also noted that Claimant had a depressed mood and a sad and tearful affect. (*Id.*) Claimant was diagnosed with acute periodontitis and prescribed an antibiotic, and she was referred to another provider for treatment of her depression and anxiety. (*Id.* at 302.) Several weeks later, on December 6, 2018, Claimant presented to her primary care physician for the first time "for over 1 year." (*Id.* at 303.) She reported "increased Heartburn[] and leg movements at night." (*Id.*) A physical examination was normal. (*Id.* at 304–05.) A depression screening was "negative for symptoms." (*Id.* at 307.) Imaging of Claimant's chest performed the following day revealed "No plain radiographic evidence of acute cardiopulmonary disease." (*Id.* at 317.) On January 3, 2019, Claimant underwent a pulmonary function test, which revealed "Moderate obstructive impairment with significant air trapping and hyperinflation." (*Id.* at 318.)

About two months later, on March 12, 2019, Claimant presented to a nurse practitioner who specializes in mental health treatment "for an initial psychiatric evaluation for medication management." (*Id.* at 309.) She reported "a long history of psychiatric treatment," but stated that she had not been treated in "a number of years" and had previously been "prescribed several psychotropic medications, but they have been ineffective." (*Id.*) Claimant "complains of anxiety, poor concentration, inattention, poor focus, poor motivation, panic attacks, low mood and irritability on a daily to weekly

5

basis." (*Id.*) Upon examination, the nurse practitioner observed that Claimant had "Decreased concentrating ability" but noted no other abnormal findings. (*Id.* at 312.) She diagnosed Claimant with "Moderate bipolar II disorder, most recent episode major depressive" and "Generalized anxiety disorder." (*Id.*) She prescribed an antidepressant. (*Id.* at 313.) Claimant returned for a follow-up appointment on April 11, 2019, and reported that "She felt much better initially and then she felt like [the antidepressant] 'fizzled' out." (*Id.* at 314.) A mental status examination was normal. (*Id.* at 315.) The nurse practitioner directed Claimant to increase the dosage of her antidepressant and prescribed two additional medications. (*Id.* at 316.)

    2. *Consultative Psychological Examination: Lester Sargent, M.A.*

Licensed psychologist Lester Sargent, M.A. performed a consultative psychological examination of Claimant on February 6, 2017. (*Id.* at 241–46.) Claimant told the consultative examiner that she previously received SSI benefits from 1992 until 2015 for her mental impairments and related that she had been diagnosed with bipolar disorder, obsessive–compulsive disorder, agoraphobia, social anxiety, and post-traumatic stress disorder. (*Id.* at 242.) She reported fear and anxiety about going in public, excessive cleanliness, trouble sleeping, a history of substance abuse, and panic attacks. (*Id.*)

The consultative examiner noted that Claimant "described a history of recurrent major depressive episodes, hypomanic episodes, and manic episodes consist [sic] with individuals often diagnosed with Bipolar I Disorder" and "a history of recurrent unexpected panic attacks and fear of additional attacks." (*Id.*) He further remarked that she "acknowledged a history of opioid use associated with tolerance and withdrawal symptoms between 2002 and 2012" but "has not consumed any form of opioids since that time" and that she "acknowledged a history of alcohol use associated with tolerance and

6

withdrawal symptoms" but "continues to use alcohol on a regular basis despite the knowledge that continued use poses significant psychological and physical consequences." (*Id.* at 242–43.) He also noted that Claimant "reported two traumatic events" from her childhood, and "Symptoms of posttraumatic stress disorder were discussed with [her, but] the full diagnostic criteria were not met for diagnosis at this time." (*Id.* at 243.) Claimant told the consultative examiner that she had received mental health treatment in the past and had been prescribed medication by her primary care physician, but "she is not currently taking any type of psychotropic medications" or "receiving any type of mental treatment." (*Id.*)

Upon mental status examination, the consultative examiner observed that Claimant "appeared for the interview casually dressed and [with] proper hygiene" and grooming and that she "Appeared her stated age of 46 years." (*Id.* at 244.) He noted that Claimant was "cooperative during evaluation," made good eye contact, and was fully oriented. (*Id.*) Her "mood was marked for depression and anxiety symptoms," and her "Affect was somewhat labile." (*Id.*) Her "Thought processes were connected with occasional circumstantialities," and her "Thought content was significant for suspicions of others," but "There was no evidence of unusual perceptual experiences." (*Id.*) The consultative examiner observed that Claimant had "mildly impaired" judgment and "fair" insight. (*Id.*) He noted "evidence of mild psychomotor agitation" but remarked that Claimant "denied suicidal and homicidal ideation." (*Id.*) Her immediate and recent memory was normal, but her remote memory was "mildly deficient." (*Id.*) She had normal concentration, "mildly deficient" persistence, and "somewhat variable" pace. (*Id.*) The consultative examiner observed that Claimant's social functioning during the examination "was moderately impaired." (*Id.* at 244–45.)

The consultative examiner diagnosed Claimant with "Bipolar I Disorder, Most Recent Episode, Depressed, Moderate . . . based upon information obtained from [Claimant] indicating a history of recurrent major depressive episodes, hypomanic episodes, and manic episodes consistent with individuals diagnosed with Bipolar I Disorder." (*Id.* at 245.) He diagnosed her with "Panic Disorder . . . based upon [her] report of recurrent unexpected panic attacks and fear of additional attacks." (*Id.*) He diagnosed her with "Alcohol Use Disorder . . . based on [her] acknowledgement regarding history of alcohol use." (*Id.*) And he diagnosed her with "Opioid Use Disorder, Sustained Full Remission . . . based upon [her] report regarding history of opioid use associated tolerance and withdrawal symptoms" and her statement that "she has not used any form of opioids" since "participat[ing] in rehabilitation program in 2010." (*Id.*)

When summarizing Claimant's self-reported social functioning, the consultative examiner noted that she stated that she "goes to store" and "runs errands on an as-needed basis" and "talks on the telephone when necessary" but "does not dine out or visits [sic] family members due to her anxiety and depressive symptoms." (*Id.*) Claimant also told the consultative examiner that she does not exercise, but she reads as a hobby. (*Id.*) She stated that "She tends not to keep medical appointments due to anxiety" and "She does not attend church or other social functions, but she did report several friends with whom she maintains contact." (*Id.*) Claimant told the consultative examiner that she did not have a checking account or "a source of income" and "relies on her ex-boyfriend for financial assistance at this time." (*Id.*) When summarizing Claimant's self-reported daily activities, the consultative examiner noted that she reported that "She is able to perform basic self-care duties without assistance" and on a typical day, she wakes up by noon and spends the day "sitting around and playing a game on her phone or listening to music,"

talking to her mother and her siblings, or watching television. (*Id.* at 246.) She stated that "She rarely goes outside and she tends to miss scheduled appointments." (*Id.*) The consultative examiner remarked that Claimant "may require assistance in managing funds given her history of alcohol use disorder." (*Id.*)

    *3. Consultative Medical Examination: Dr. Stephen Nutter, M.D.*

Dr. Stephen Nutter, M.D. performed a consultative internal medicine examination of Claimant on September 5, 2017. (*Id.* at 248–56.) Claimant reported experiencing shortness of breath and "frequent wheezing and coughing" and told the consultative examiner that she had been diagnosed with chronic obstructive pulmonary disease, asthma, and emphysema. (*Id.* at 248.) She stated that she had previously used an inhaler but "has been out of it for five years" and "has not really pursued getting [another] one." (*Id.*) She also told the consultative examiner that "Cold weather as well as a lot of cleaning chemicals can aggravate her breathing." (*Id.*) She remarked that she "smokes one pack [of cigarettes] a day for 30 years" and "drinks alcohol once a month." (*Id.* at 249.) Claimant also reported chest pain, joint pain "in the hands and right hip," abdominal pain, and headaches. (*Id.*)

Upon physical examination, the consultative examiner noted that Claimant was six feet tall and weighed 184 pounds, her blood pressure was 142/92, and she was right-handed. (*Id.* at 249.) He observed that she "ambulates with a normal gait, which is not unsteady, lurching, or unpredictable," and did "not require a handheld assistive device." (*Id.*) He noted that she "appears stable at station and comfortable in the supine and sitting positions" and "is able to hear and understand conversational voices without difficulty." (*Id.*) The consultative examiner did not note any abnormal findings with respect to Claimant's head, neck, cardiovascular system, or abdomen. (*Id.* at 250.) When

9

examining her chest, he observed that her "lung fields are clear to auscultation and percussion, without wheezes, rales, or rhonchi," her "breath sounds are symmetrical bilaterally," and she was not "short of breath with exertion or when lying flat during the exam." (*Id.*) However, the consultative examiner remarked that "Pulmonary function studies did show moderate [chronic obstructive pulmonary disease]." (*Id.* at 251; *see id.* at 253–56.)

When examining Claimant's upper extremities, the consultative examiner observed that her "shoulders, elbows and wrists are nontender," "There is no redness, warmth, swelling or nodules," and she had normal range of motion. (*Id.* at 250, 252.) She had "no tenderness, redness, warmth or swelling" and "no atrophy" in her hands, and she was able to make a fist bilaterally and "write and pick up coins with either hand without difficulty." (*Id.* at 250.) She had full grip strength and normal range of motion in her hands. (*Id.* at 250, 252.) When examining Claimant's lower extremities, the consultative examiner observed "no tenderness, redness, warmth, swelling, fluid, laxity or crepitus of the knees, ankles or feet" and "no calf tenderness, redness, warmth, cord sign or Homan's sign," and she had normal range of motion aside from slightly decreased flexion in both knees. (*Id.*)

When examining Claimant's cervical spine, the consultative examiner observed "no tenderness over the spinous processes," "no evidence of paravertebral muscle spasm," and normal range of motion. (*Id.*) Examination of her dorsolumbar spine "reveals normal curvature," "no evidence of paravertebral muscle spasm," and "no tenderness to palpation of the dorsolumbar spinous processes." (*Id.* at 250.) Sitting and supine straight-leg-raise tests were normal, and Claimant could "stand on one leg at a time without difficulty." (*Id.*) The consultative examiner observed "no hip joint tenderness,

redness, warmth, swelling or crepitus." (*Id.*) Claimant's range of motion in her dorsolumbar spine was slightly decreased. (*Id.* at 252.)

The consultative examiner also observed that Claimant's cranial nerves were intact, she had full muscle strength in her upper and lower extremities without atrophy, and her "Sensory modalities are well preserved." (*Id.* at 250.) Her reflexes were symmetrical and graded normally, Hoffman and Babinski's signs were negative, and "There is no clonus." (*Id.* at 250–51.) Claimant's "Cerebellar function is intact," and she "is able to walk on the heels and toes" and "perform tandem gait and squat without difficulty." (*Id.* at 251.)

Claimant was diagnosed with chronic obstructive pulmonary disease due to her pulmonary function studies. (*Id.*)

C. *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d

337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The

claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d),

416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the date she applied for SSI benefits. (Tr. at 74.) She found that Claimant's depression, substance abuse, anxiety, and chronic obstructive pulmonary disease constituted "severe" impairments. (*Id.*) However, she found that those impairments, or a combination thereof, failed to meet or medically

equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 74–76.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: she must avoid temperature extremes. She must avoid exposure to fumes, odors, dust, and poor ventilation. She is able to understand, remember, and carry out simple, routine, repetitive instructions. She can tolerate occasional, superficial interaction with supervisors and coworkers. She can tolerate occasional to no interaction with the public. She requires low stress jobs defined as no production rate pace work, only occasional decision-making responsibilities, and only occasional changes in job setting.

(*Id.* at 76.)

The ALJ concluded that Claimant "has no past relevant work." (*Id.* at 81.) She noted that Claimant is "a younger individual" with "at least a high school education" and that "[t]ransferability of job skills is not an issue because [Claimant] does not have past relevant work." (*Id.*) Because the ALJ determined that Claimant was able to meet the demands of work at all exertional levels but had nonexertional limitations, she enlisted a vocational expert to aid in her finding that Claimant is capable of working as a mail sorter, price marker, or dishwasher. (*Id.* at 81–82.) As a result, the ALJ concluded that Claimant was not "under a disability . . . since May 12, 2017, the date the [SSI] application was filed." (*Id.* at 82.)

## II. LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by

substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.  ANALYSIS

Claimant argues that the ALJ erred in her duty to develop the administrative record by not submitting interrogatories to the consultative examiners "in order to ascertain their opinions as to [Claimant's] functional limitations." (ECF No. 12 at 4–5.) She asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 5.) The Commissioner responds that the record in this case is fully developed, and the ALJ's RFC assessment incorporated the consultative examiners' findings. (ECF No. 13 at 7–9.)

"[T]he ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on evidence

16

submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986); *Thompson v. Colvin*, No. 3:14-cv-15949, 2015 WL 13746683, at *13 (S.D.W. Va. June 30, 2015) ("[A]n ALJ has the duty to fully and fairly develop the record."), *adopted by* 2015 WL 5626513 (S.D.W. Va. Sept. 24, 2015). However, the ALJ "is not required to act as Claimant's counsel" and may "presume that Claimant's counsel presented Claimant's strongest case for benefits." *Perry v. Astrue*, No. 3:10-cv-01248, 2011 WL 5006505, at *15 (S.D.W. Va. Oct. 20, 2011). As the Commissioner points out, Claimant is represented by counsel, and he "did not suggest that the administrative record was incomplete or otherwise request that the ALJ send interrogatories to the consultative examiners during the hearing." (ECF No. 13 at 7.)

Indeed, during the hearing, the ALJ asked Claimant's counsel if he had "reviewed the electronic record," and he answered in the affirmative. (Tr. at 14.) She then asked if it was "up to date," and he responded, "To the best of our ability, Your Honor." (*Id.*) He did not assert that anything was missing from the administrative record or request that the ALJ seek medical opinions from the consultative examiners before she admitted the exhibits into evidence. (*Id.*) Later in the hearing, Claimant, her counsel, and the ALJ again discussed whether all of Claimant's treatment notes were in the record. (Tr. at 43–44.) Although both consultative examinations were mentioned, Claimant's counsel again did not request that the ALJ obtain additional information from the examiners. (*Id.*) "[C]laimant, through counsel, [may not] rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation." *Perry*, 2011 WL 5006505, at *15 (quoting *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008)).

"An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of

17

the evidence." *Id.* at \*16 (quoting *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001)). Claimant argues that further development was required because the ALJ, in summarizing the consultative examiners' findings, noted that neither provided a medical opinion about Claimant's functional abilities. (ECF No. 12 at 5; Tr. at 79–80.) But "the absence of a medical opinion in a consultative examination report [does] not make the report incomplete." 20 C.F.R. § 416.919n(c)(6). The ALJ did not ignore the consultative examiners' findings merely because they did not offer medical opinions. (Tr. at 79–80.) In fact, she accounted for those findings in her RFC assessment.

At bottom, the administrative record must contain "sufficient medical evidence" for the ALJ "to make an informed decision about [the claimant's] impairments." *Craft v. Apfel*, 164 F.3d 624 (4th Cir. 1998) (table), 1998 WL 702296, at \*3; *Laney v. Astrue*, No. 3:09-cv-00780, 2011 WL 11889, at \*11 (S.D.W. Va. Jan. 4, 2011) (stating that ALJ's duty to develop record is "to insure that the record contain[s] sufficient evidence upon which she could make an informed decision" (citing *Ingraham v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007))). Here, although the consultative examiners did not provide medical opinions about Claimant's functional limitations, the ALJ still conducted an RFC assessment that incorporated their findings, which she found to be consistent with those of Claimant's treating providers. (Tr. at 79–80.) In rejecting the opinions of the state-agency consultants, the ALJ explained that Claimant's treatment records, including a pulmonary function test that was performed by the consultative medical examiner, warranted an RFC "that avoids temperature extremes and exposure to fumes, odors, dust, and poor ventilation." (*Id.* at 80.) She also noted that Claimant "has a long history of mental health problems, albeit only recently treated," that required an RFC "for unskilled, low stress work with limited interaction with others." (*Id.*) Nothing

about her analysis suggests that the ALJ had insufficient information to formulate Claimant's RFC.

As the Commissioner points out, the RFC assessment is an administrative finding that is entrusted to the ALJ when the case reaches her. (ECF No. 13 at 8.) 20 C.F.R. § 416.946(c). She is "not required to obtain an expert medical opinion as to [the claimant's] RFC" and instead may rely on the claimant's "subjective complaints, the objective medical evidence, and the opinions of treating, examining, and nonexamining physicians" to conduct the RFC assessment. *Felton-Miller v. Astrue*, 459 F. App'x 226, 231 (4th Cir. 2011) (per curiam). That is precisely what she did in this case. (Tr. at 76–81.) Accordingly, the undersigned **FINDS** that the ALJ did not err by failing to obtain interrogatories from the consultative examiners.

### IV.   CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 12), **GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.

Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: May 7, 2021

Dwane L. Tinsley
United States Magistrate Judge